**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANTOINETTE SHAW, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   Civil Action No. 17-00738 (DLF/RMM) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

This case arises from administrative proceedings that Plaintiff Antoinette Shaw ("Plaintiff" or "Ms. Shaw") brought against the District of Columbia ("the District"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, to challenge the District of Columbia Public Schools' ("DCPS") provision of a free and appropriate public education ("FAPE") for Plaintiff's minor child S.S. ("S.S." or "the Student). *See generally* Compl., ECF No. 1. Specifically, Ms. Shaw challenges certain findings made in a February 1, 2017 Hearing Officer Determination ("HOD") issued by the District of Columbia's Office of the State Superintendent of Education and asks the Court to reverse the HOD and remand for further proceedings.

In the pending Motion for Summary Judgment, which Ms. Shaw filed on behalf of her daughter, S.S., Ms. Shaw alleges that the Impartial Hearing Officer ( "Hearing Officer") erred in four ways: (1) by failing to provide an adequate remedy for her finding that DCPS denied S.S. a FAPE by failing to conduct any new assessments as part of its triennial review of S.S.'s needs; (2) by failing to find that DCPS denied S.S. a FAPE by including inadequate plans for S.S.'s transition out of high school in the individualized educational plans ("IEPs") prepared after S.S.

turned sixteen; (3) by failing to find that DCPS denied S.S. a FAPE by excluding Ms. Shaw from certain aspects of S.S.'s educational planning; and (4) by failing to find that DCPS denied S.S. a FAPE by prematurely graduating her from high school despite her significant academic shortcomings and failing to give Ms. Shaw adequate prior written notice of S.S.'s upcoming graduation. *See* Pl.'s Mot. for Summ J. ("Pl.'s Mot."), ECF No. 10. The District has cross-moved for summary judgment and contends that the HOD should be affirmed because the applicable law and the record developed during the administrative proceedings support the Hearing Officer's rulings. *See* Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n"), ECF No. 12. Having considered the relevant filings[1] and the applicable law, and for the reasons set forth below, the undersigned recommends that the Court GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion for Summary Judgment, and GRANT-IN-PART and DENY-IN-PART Defendant's Cross-Motion for Summary Judgment.

## BACKGROUND

### I.    Statutory Framework

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To that end, local school districts must ensure that "[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located,

---

[1]    The following documents are also pertinent to the pending motion: Admin. R. ("AR"), ECF No. 7; Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n"), ECF No. 12; Def.'s Cross Mot. for Summ. J., ECF No. 13 (Def.'s Cross Mot.); Pl.'s Reply in Opp'n to Def.'s Cross Mot. ("Pl.'s Reply"), ECF No. 17; Def.'s Reply to Pl.'s Opp'n to Def.'s Cross Mot. for Summ. J., ECF No. 21 ("Def.'s Reply); Compl., ECF No. 1.

and evaluated." *Id.* § 1412(a)(3)(A). A FAPE includes "special education and related services that — (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with [a child's] individualized education program." *Id.* § 1401(9).

The IDEA "requires the school district to create and implement an [individualized education program]" for disabled children who are eligible for special education services. *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006). This IEP is "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (noting that Congress "envision[ed] the IEP as the centerpiece of the statute's education delivery system for disabled children"); *Lesesne*, 447 F.3d at 830; 20 U.S.C. § 1414(d)(2)(A). The IEP is "[p]repared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child." *Honig*, 484 U.S. at 311 (citing 20 U.S.C. § 1401(19) (1988)). The final product "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* Once a child reaches age sixteen, the IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments" and explain

the transition services necessary to help the student reach those goals. 20 U.S.C. §
1414(d)(1)(A)(i)(VIII).

The IEP must be "reasonably calculated to enable a child to make progress appropriate in
light of the child's circumstances." *Endrew*, 137 S. Ct. at 999. The IEP also must comply with
the IDEA's requirement that students "be educated in the least restrictive environment possible."
*Leggett v. District of Columbia*, 793 F.3d 59, 74 (D.C. Cir. 2015). After the IEP is developed,
the school district must provide the child with an appropriate educational placement that
comports with the IEP. *See* 34 C.F.R. § 300.116(b)(2); *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*,
579 F. Supp. 2d 89, 99 (D.D.C. 2008).

Parents who disagree with the IEP or believe that a school district has violated other
IDEA requirements may file a due process complaint. *See* 20 U.S.C. § 1415(b)(6). If the parties
are unable to resolve the complaint within thirty days, the parents are entitled to a due process
hearing before the local education agency. *Endrew*, 137 S. Ct. at 994; *see also* 20 U.S.C. §
1415(f)(1), (g). Either party may appeal an adverse ruling to a federal district court. *See* 20
U.S.C. § 1415(i)(2).

## II.     Factual Background

The events pertinent to this case occurred between the 2012–2013 school year and the
2015–2016 school year. At that time, S.S. was a student eligible for special education services
based on an IDEA classification of Intellectual Disability. AR 6; AR 111 (Final Eligibility
Determination Report).

### A.     Overview of S.S.'s Disability and Anacostia High School's Services for S.S.

S.S. was a student at Anacostia High School, where she received special education
services based on her Intellectual Disability. AR 6; AR 950 (Test. Of Latisha Chisholm

("Chisholm Test.")). S.S. had an independent comprehensive psychological evaluation on
August 27, 2012, shortly before she began ninth grade. AR 4; AR 33–47 (Comprehensive
Psychoeducational & Clinical Evaluation). Although S.S. was eligible to remain in school until
she turned twenty-two years old, she was scheduled to graduate in four years on the high school
diploma track. AR 6; AR 700–01 (Test. of Twilah Anthony ("Anthony Test.")). Throughout her
tenure at Anacostia High, S.S. was adamant about graduating and worked diligently toward
accomplishing her goal. AR 6; AR 661 (Test. of S.S. ("S.S. Test."); AR 706 (Anthony Test.).
As part of her special education, S.S. received accommodations from her teachers to help her
complete assignments and examinations. AR 6; AR 942 (Chisholm Test.).

S.S. had a team of teachers and administrators who developed annual IEP goals for her
education. *See* AR 6; AR 50, 86, 207 (IEPs dated 2/24/2015, 9/21/2015, and 4/25/2016). The
IEPs pertinent to this litigation were performed on February 24, 2015, September 21, 2015, and
April 25, 2016. *See* AR 50–73, 86–110, 207–27. Several parties provided input for the IEPs,
including S.S., her teachers, and Ms. Shaw. *See* AR 8, 50–73, 86–110, 207–27. Objective tests
such as the Brigance Transition Skills Assessments and Casey Life Skills Test also informed the
development of the IEPs. *Id.* The IEPs included goals for mathematics, reading, written
expression, and adaptive/daily living skills. *Id.*

Beginning in February 2015, S.S.'s IEPs included goals for her transition out of DCPS.
For example, one goal was for S.S. to contact a post-secondary educational program that she was
interested in attending after graduating high school, and to ask questions about the program. AR
8, 70–71, 105–08, 223–27. The IEPs also anticipated that S.S. would contact a workforce
development center to ask questions about a program she hoped to work in after high school. *Id.*

S.S. had opportunities to participate in several outside programs that school officials believed would help prepare S.S. for future training or employment. In December 2015, S.S. was accepted into the Competitive Employment Opportunities Exercises in Transition Academy ("CEO EXIT") Program, which was designed to help students navigate and manage the expectations of postsecondary training or a workplace setting. AR 9; AR 136 (CEO Exit Acceptance Letter). In March 2016, S.S. applied to CVS's Workforce Development Program, which is designed to provide workplace assistance and placement to adults with disabilities. AR 9; AR 137–140 (CVS Workforce Application). S.S. expressed interest in becoming a CVS pharmacy technician. AR 137. A transition specialist at Anacostia High School provided some travel training with S.S., including drawing a map to S.S.'s assigned CVS store and traveling the route with her. AR 9–10; AR 1001 (Anthony Test.). In addition, On the Move provided travel training to S.S. through its partnership with DCPS. AR 10; AR 1002 (Anthony Test.). Ultimately, S.S. did not attend either program because her mother expressed concerns about her ability to succeed. AR 1001–02 (Anthony Test.).

### B. Ms. Shaw's Involvement with S.S.'s Educational Planning

Ms. Shaw participated in most of S.S.'s IEP meetings during the relevant time period. Ms. Shaw was not present at the meeting for the February 24, 2015 IEP, but DCPS sent her a letter three days afterward offering to reconvene S.S.'s IEP team to discuss her IEP. AR 7. S.S. turned eighteen years old in July 2015. AR 671 (Test. Of Antoinette Shaw ("Shaw Test.")).[2] Another IEP meeting occurred in September 2015, after S.S. had turned eighteen, and both S.S. and Ms. Shaw attended that meeting in person. AR 86. In April 2016, S.S. attended an IEP in

---

[2] Due to an error with the tapes of the hearing, the Hearing Officer read Ms. Shaw's testimony into the record by summarizing the contents of the Hearing Officer's notes. AR 669.

person and provided input to develop a Summary of Performance in preparation for S.S.'s June 2016 graduation. AR 208, 228–38. The parties dispute whether Ms. Shaw attended the April 2016 IEP meeting. AR 5.

On November 5, 2015, after S.S. turned eighteen years old, S.S. executed a durable power of attorney document, authorizing Ms. Shaw to act as her agent in a broad array of areas, including special education. AR 131–35. Despite Ms. Shaw's power of attorney status, Ms. Shaw and S.S. argued about whether S.S. should graduate. AR 671 (Shaw Test.). Ms. Shaw did not think that S.S. should graduate, although S.S. was adamant that she should. *Id.*. During meetings at school, S.S. would often ask for her mother to be present when making decisions, but the teachers told her that she did not need her mother present and pushed her to make her own decisions. AR 661–63 (S.S. Test.).

Ms. Shaw voiced her concerns about S.S.'s participation in job training programs to Sean Duling, S.S.'s transition specialist at Anacostia High School. AR 671–73 (Shaw Test.). Ms. Shaw told Mr. Duling that she believed S.S. lacked the skills necessary for the workforce development programs based on the amount of travel required and an on-site CVS manager's assertion that S.S. would not qualify for the role. *Id.* Ms. Shaw claims that she called Anacostia High School more than once to arrange another IEP meeting or receive notes from the April 2016 IEP meeting, but she never received a response. AR 683.

While S.S. was enrolled in school, Ms. Shaw was generally satisfied with the educational services Anacostia High School provided S.S. and believed that S.S.'s team was "doing the right thing." AR 680–82 (Shaw Test.). Conversations with DCPS staff members led Ms. Shaw to believe that S.S. would be prepared to move on with her life after graduation. AR 678 (Shaw Test.). Ms. Shaw eventually became concerned that S.S. was not ready for job training. AR 681

(Shaw Test.).  At some point, Ms. Shaw did not think that S.S. should graduate.  AR 670–71

(Shaw Test.).  However, staff never counseled Ms. Shaw that S.S. could remain in school and

receive special education past age eighteen.  AR 669 (Shaw Test.).  Ms. Shaw would have agreed

to allow S.S. to remain in school until she was twenty-two years old if Ms. Shaw had known that

was an option.  AR 678 (Shaw Test.).   After S.S. graduated, Ms. Shaw recognized that S.S. "had

a lot of issues that could have been addressed if she had stayed in school longer." AR 682 (Shaw

Test.).

### C.      S.S.'s Progress at Anacostia High School

As a freshman in 2012, S.S.'s overall cognitive ability fell in the lower extreme range.

AR 6, 38.  During her high school tenure, S.S. made regular, albeit not uniform, progress on her

IEPs.  *See* AR 6; AR 75–85 (IEP Progress Report dated June 2015); AR 240–50 (IEP Progress

Report dated April 2017).  According to Anacostia High School's Special Education Coordinator

Latisha Chisholm, a student with S.S.'s intellectual disability would not be expected to make

tremendous progress.  AR 7, 950.  Upon graduation in June 2016, S.S. was performing between a

third and fifth grade academic level.  AR 7; AR 947 (Chisholm Test.).  S.S. could not tell time,

take the metro by herself, or count money, and she needed support for her day-to-day activities.

AR 661 (S.S. Test.); AR 670 (Shaw Test.).  Yet, S.S. graduated with a 3.1 GPA and was ranked

in the top 10% of her class.  AR 256–58 (DCPS Transcript & Diploma), ECF No. 26-1.

S.S. initially was excited to graduate.  AR 661 (S.S. Test.).  However, once she graduated

she realized that she lacked "the skill that it takes [to function in] everyday life and therefore

struggle[d]."  *Id.*  A comprehensive evaluation conducted in November 2018, two years after

S.S. graduated, found that S.S. has the reading equivalency of a nine year old, the math

equivalency of an eight year, three month old, and the written language of a ten year, eleven month old. *See* Comprehensive Psychological Exam, ECF No. 25-1.

### III. Procedural Background

#### A. <u>Administrative Proceedings</u>

On November 18, 2016, Ms. Shaw filed the Due Process Complaint ("DPC") underlying the HOD in this matter. AR 413–22. DCPS responded on December 6, 2016. AR 435–43. The parties appeared before Hearing Officer Nakeisha Blount ("Hearing Officer") on December 21, 2016 for a Pre-Hearing Conference. AR 477. The DPC identified the following issues for resolution:

1. Whether DCPS denied the student a FAPE during the 2015-2016 school year by failing to adequately evaluate the student including by failing to perform triennial evaluations including a comprehensive psychological evaluation and an appropriate comprehensive vocational assessment, to include assessments for post-secondary education, employment and independent living abilities;

2. Whether DCPS denied the student a FAPE by failing to develop appropriate IEPs in February 2015, September 2015, and April 2016, including by failing to develop appropriate and meaningful transition plans. The IEPS were not reasonably calculated to provide the student with educational benefit or amended to meet her specific academic needs and difficulties. All the student's academic and functional goals were vague and/or not appropriate for the student's cognitive ability.

3. Whether DCPS denied the student a FAPE by failing to allow the student's parent to participate in all of the student's educational planning after July 2015 when the student turned 18. The parent attended the September 2015 IEP meeting but did not participate in the development of the IEP. The parent did not attend the April 2016 IEP meeting.

4. Whether DCPS denied the student a FAPE by prematurely exiting her from special education through giving her a diploma, and by failing to comply with federal and local regulations. Specifically, plaintiff asserts that DCPS failed to provide the parent (1) Summary of Performance (at any point), (2) Prior Written Notice (PWN) (prior to graduation), and (3) Notice of Transfer of Rights (prior to the student turning 18 years old).

AR 478. As relief, Ms. Shaw sought: (a) a finding that S.S. had been denied a FAPE; (b) an Order directing DCPS to fund an independent comprehensive psychological evaluation at market rate; (c) an Order requiring that DCPS conduct a comprehensive vocational evaluation (equivalent to the Brigance Transition Inventory) within 10 days of the HOD; (d) an order requiring that DCPS develop, fund, and execute an appropriate transition plan; and (e) an Order directing DCPS to provide the student compensatory education for the 2014–2015 and 2015–2016 school years including tutoring hours for functional and academic remediation and a vocational program to be determined after the vocational and psychological evaluations are completed. AR 479.

The parties, each represented by counsel, convened for a Due Process Hearing on January 10, 2017, January 11, 2017, and January 18, 2017. AR 4, 602, 773, 1050. Plaintiff presented three witnesses: S.S., Ms. Antoinette Shaw, and Ms. Twilah Anthony. AR 4, 604, 772. Ms. Anthony is an educational advocate who testified as an expert witness in special education programming, placement, and IEP planning. AR 4; AR 694 (Anthony Test.). DCPS presented two expert witnesses: Ms. Latisha Chisholm, the Special Education Coordinator at Anacostia High School and S.S.'s former environmental science teacher, and Mr. Christopher Nace, DCPS' interim Director of Secondary Transition. AR 4; AR 937–38 (Chisholm Test.); AR 988 (Nace Test.). Ms. Chisholm testified as an expert in special education programming and placement, and Mr. Nace testified as an expert in special education programming and placement, particularly in transitions for students with special needs. AR 937 (Chisholm Test.), 988–89 (Nace Test.).

The Hearing Officer issued a HOD on February 1, 2017 and issued a revised version on February 4, 2017 to correct formatting and typographical errors. AR 3, n.2. The Hearing Officer

determined that DCPS's reliance on evaluations and assessments that were several years old

when it conducted its triennial review was unreasonable and denied S.S. a FAPE during the

2015–2016 school year. AR 11. Next, the Hearing Officer reviewed Ms. Shaw's challenge to

the IEPs and transition plans contained therein. AR 12. The Hearing Officer concluded that the

IEPs likely contained inappropriate goals, "particularly to the extent that they were repeated in

September 2015 and April 2016," but did not clearly address whether those deficiencies denied

S.S. a FAPE. *Id.* The Hearing Officer rejected Ms. Shaw's assertion that the IEPs' transition

goals were inappropriate, reasoning that the goals were "reasonably connected to [S.S.'s]

expressed interests, her realistic prospects, and were sufficiently ambitious . . . with

accommodations." AR 12. Next, the Hearing Officer found that DCPS did not deny S.S. a

FAPE by failing to allow Ms. Shaw to participate in all of the educational planning after S.S.

turned eighteen. AR 12. The Hearing Officer concluded that Ms. Shaw participated in S.S.'s

educational planning, as evidenced by her engagement in a September 2015 meeting and various

conversations with teachers throughout the school year including after S.S.'s eighteenth

birthday. AR 12. Finally, the Hearing Officer found that DCPS did not deny S.S. a FAPE by

permitting her to graduate, particularly given that S.S., Ms. Shaw, and the team opted to keep

S.S. on the diploma track and S.S. was adamant about graduating on time. AR 13. However, the

Hearing Officer found that DCPS's apparent failure to give Ms. Shaw prior written notice

("PWN") of S.S.'s graduation inhibited Ms. Shaw's ability to participate in providing a FAPE to

S.S. AR 13. The Hearing Officer reasoned that the PWN would have advised Ms. Shaw of the

alternatives to graduation, such as S.S.'s option to remain in school beyond June 2016, and Ms.

Shaw would have objected to the graduation had she been adequately informed. AR 13.

As relief, the Hearing Officer ordered DCPS to provide a comprehensive psychological evaluation at market rate within ten business days of the HOD. AR 13. The Hearing Officer did not indicate whether this relief was designed solely to remedy DCPS's failure to conduct updated assessments during the triennial review or also was intended to remedy the failure to provide PWN of S.S.'s upcoming graduation.

### B. The Instant Action

On April 21, 2017, Ms. Shaw filed this action challenging the HOD. *See generally* Compl. After the District filed the Administrative Record, the parties cross-moved for summary judgment. *See generally* AR; Pl.'s Mot.; Def.'s Opp'n. Ms. Shaw also moved to strike a declaration submitted with the District's cross-motion. *See* Pl.'s Mot. to Strike, ECF No. 15. District Judge Dabney L. Friedrich subsequently referred the cross motions and the motion to strike to the undersigned for a report and recommendation. *See* 03/07/2018 Min. Order. Judge Friedrich adopted the undersigned's Report and Recommendation and denied Plaintiff's Motion to Strike. *See* 09/26/2018 Min. Order. After briefing was complete, Ms. Shaw filed Status Reports to advise the Court of the status of S.S.'s pending comprehensive psychological evaluation. *See* Status Reports, ECF Nos. 23–25. S.S. was evaluated on November 10, 2018, and Ms. Shaw filed the results of that evaluation shortly thereafter. *See* ECF No. 25-1.

### LEGAL STANDARD

### I. Summary Judgment

Federal Rule of Civil Procedure 56 governs summary judgment motions, which must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When determining whether summary judgment is appropriate, a court must view the evidence and inferences in the light most

favorable to the party opposing summary judgment. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, if the moving party satisfies its initial burden of showing that no genuine dispute exists regarding any material fact, the opposing party must still demonstrate more than "[t]he mere existence of a scintilla of evidence" in support of its position in order to make summary judgment improper. *Anderson*, 477 U.S. at 252.

In the IDEA context, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *N.W. v. District of Columbia*, 253 F. Supp. 3d 5, 12 (D.D.C. 2017) (quoting *D.R. ex rel. Robinson v. Gov't of D.C.*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009)) (internal quotation marks omitted); *Brown v. District of Columbia*, 179 F. Supp. 3d 15, 23 (D.D.C. 2016); *see* 20 U.S.C. § 1415(i)(2)(C) (noting that the court "shall hear additional evidence at the request of a party"). When no additional evidence is introduced, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Q.C-C. v. District of Columbia*, 164 F. Supp. 3d 35, 44 (D.D.C. 2016) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)) (modifications omitted). Thus, in the absence of additional evidence, a motion for summary judgment under the IDEA "is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

## II.    Review of IDEA Administrative Decisions

Where, as here, a party seeks to challenge an administrative decision, a "party aggrieved by the findings and decision" has the right to bring a civil action.  20 U.S.C. § 1415(i)(2)(A). The party challenging the hearing officer's determination carries "the burden of persuading the court that the hearing officer was wrong."  *Kerkam v. McKenzie* (*Kerkam I*), 862 F.2d 884, 887 (D.C. Cir. 1989); *see also Brown*, 179 F. Supp. 3d at 23.  When evaluating such challenges, a court receives "the records of the administrative proceedings" and must "hear additional evidence at the request of a party" before "grant[ing] such relief as the court determines is appropriate" based "on the preponderance of the evidence."  20 U.S.C § 1415(i)(2)(C).  Thus, the IDEA standard of review is "more rigorous" and less deferential than that applied to review of administrative decisions under the Administrative Procedure Act.  *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005); *Kerkam I*, 862 F.2d at 887.

However, "this standard does not authorize unfettered *de novo* review."  *Brown*, 179 F. Supp. 3d at 23.  Courts review questions of law *de novo*.  *Reid*, 401 F.3d at 521.  Otherwise, courts must give "due weight" to the administrative proceedings and should not "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206; *see Kerkam ex rel. Kerkam v. Superintendent, D.C. Pub. Schs.* (*Kerkam II*), 931 F.2d 84, 87–88 (D.C. Cir. 1991) (deferring to the findings of the hearing officer where "the administrative record contains sufficiently reasoned, specific findings to support [the] conclusion"); *see also N.W.*, 253 F. Supp. 3d at 12.  Courts accord less weight to determinations that do not involve the exercise of educational expertise "because a federal court is just as well suited to evaluate the situation."  *Serpas v. District of Columbia*, No. 02-CV-2227 (HHK), 2005 WL 3211604, at *5 (D.D.C. Oct. 28, 2005) (quoting *Kings Local Sch. Dist. Bd. of Educ. v.*

*Zelazny*, 325 F.3d 724, 728 (6th Cir. 2003)) (citing *McKenzie v. Smith*, 771 F.2d 1527, 1535 n.17 (D.C. Cir. 1985)) (internal quotation marks omitted).  Finally, "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct."  *Brown*, 179 F. Supp. 3d at 23 (quoting *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006)) (internal quotation marks omitted).  Those factual findings warrant deference "unless [the Court] can point to contrary nontestimonial extrinsic evidence [in] the record."  *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012).

## DISCUSSION

Four issues are in dispute in the pending cross-motions for summary judgment: (1) whether the additional evaluation that the Hearing Officer ordered adequately remedied DCPS's reliance on outdated evaluations during its triennial review of S.S.'s IEP or whether compensatory education is necessary to redress that denial of a FAPE; (2) whether DCPS denied S.S. a FAPE by providing her with inadequate transition plans in her IEPs; (3) whether DCPS denied S.S. a FAPE by not allowing Ms. Shaw to participate in all aspects of S.S.'s educational planning; and (4) whether DCPS denied S.S. a FAPE by graduating her from high school before she was adequately prepared to leave school and by failing to give Ms. Shaw prior written notice of S.S.'s upcoming graduation.  *See generally* Pl.'s Mot.  The following analysis will address each issue in turn.

**I.     Whether the Hearing Officer Erroneously Concluded that Requiring DCPS to Provide an Additional Comprehensive Psychological Evaluation Would Adequately Remedy the District's Denial of a FAPE to S.S. During the 2015– 2016 School Year**

The parties dispute whether the Hearing Officer awarded relief that was sufficient to remedy the denial of a FAPE caused by DCPS's reliance on outdated evaluations during its triennial review of S.S.'s IEP.  Once a hearing officer finds that a school district has denied the

student a FAPE, she is required to craft an award that will place a student "in the position she would be in absent the FAPE denial." *B.D. v. District of Columbia,* 817 F.3d 792, 798 (D.C. Cir. 2016). A hearing officer has "broad discretion to fashion an appropriate remedy" for a FAPE denial. *See id.* (quoting *Boose v. District of Columbia,* 786 F.3d 1054, 1056 (D.C. Cir. 2015)). Equitable relief may consist of "retrospective relief designed to compensate for yesterday's IDEA violations" or "prospective relief aimed at ensuring that the child receives tomorrow the education required by [the] IDEA." *Branham v. District of Columbia*, 427 F.3d 7, 11 (D.C. Cir. 2005). Compensatory education is a form of prospective equitable relief that "provide[s] the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id.* at 9. Any award of equitable relief "must be tailored to meet the child's specific needs." *Id.* at 11–12.

In a portion of the HOD that neither party has appealed, the Hearing Officer found that DCPS denied S.S. a FAPE when, as part of the 2015 triennial review of S.S.'s need for special education services, DCPS failed to conduct new assessments and relied on data from an October 2009 evaluation summary report instead of a more recent psychological evaluation.[3] AR 11; *see also* AR 7 (describing data on which DCPS relied). The Hearing Officer concluded that it was unreasonable for DCPS to rely on a six-year-old evaluation, and that "[t]he failure to evaluate [S.S.] denied her a FAPE." AR 11. At the conclusion of the HOD, the Hearing Officer ordered that "DCPS shall fund a comprehensive psychological evaluation at market rate within 10 business days." AR 13. The HOD does not expressly address whether the new comprehensive psychological evaluation was intended to remedy DCPS's failure to evaluate S.S. in the 2015–

---

[3] A public agency must ensure that a reevaluation of each child with a disability occurs at least once every three years, unless the parent and the public agency agree that a reevaluation is unnecessary. 34 C.F.R. § 300.303.

2016 school year, and consequently does not address how conducting a new evaluation (outside the context of developing or reviewing an IEP) would adequately remedy the denial of a FAPE. AR 11–13. The HOD also fails to address why no other form of relief — such as the compensatory education that Ms. Shaw requested — was warranted. AR 11–13.

Ms. Shaw contends that the Hearing Officer erred by failing to explain how a new comprehensive psychological evaluation could remedy the denial of a FAPE and should have awarded further relief such as compensatory education. Pl.'s Mot. at 3–5. The District counters that the evaluation was an appropriate remedy, given that S.S. was not expected to make significant progress and had exceeded expectations without any compensatory education. *See* Def.'s Opp'n at 11–13, Def.'s Reply at 2, 4.

The Hearing Officer's failure to explain why an additional psychological examination was an appropriate award, or whether it fully compensated S.S. for the FAPE denial, makes it impossible to discern the reasoning underlying the Hearing Officer's decision to deny more extensive relief. The District contends that the Hearing Officer credited the testimony of its expert witness, Latisha Chisholm, a Special Education Coordinator at Anacostia High School, regarding the limited progress that S.S. could be expected to make due to her cognitive level, and asks the Court to defer to that purported finding. *See* Def.'s Opp'n at 13. However, the HOD did not address Ms. Chisholm's testimony when discussing DCPS's failure to evaluate S.S. or when it selected a remedy.[4] *See* AR 11, 13. Like the ruling that the D.C. Circuit reversed in *B.D.*, the HOD provided no "reasoned explanation" for the Hearing Officer's apparent conclusion that no additional education services were necessary to redress the denial of a FAPE

---

[4] Indeed, the Hearing Officer implicitly rejected at least one of Ms. Chisholm's conclusions, by finding that DCPS had denied S.S. a FAPE despite Ms. Chisholm's contrary assertion. *Compare* AR 11 (finding that failure to evaluate denied S.S. a FAPE)

and wholly "failed to address the broader question of how to put [the student] in the educational position he would be in but for the FAPE denial." *B.D.*, 817 F.3d at 799 (reversing hearing officer ruling that partially rejected compensatory education proposal "without much explanation"). Consequently, the Hearing Officer's ruling merits little deference. *See Reid*, 401 F.3d at 521 ("[A] hearing decision without reasoned and specific findings deserves little deference.") (quoting *Kerkan II,* 931 F.2d at 87) (internal quotation marks omitted).

Notwithstanding the HOD's lack of a reasoned explanation, the Court could uphold the Hearing Officer's decision to award only a future comprehensive psychological evaluation if the Court independently determines that a new evaluation would fully alleviate the harm or lost educational opportunities that S.S. suffered as a result of DCPS's reliance on outdated evaluations during the triennial review. *See Reid*, 401 F.3d at 521 (noting that where HOD failed to explain reasoning for the relief awarded the district court should not have affirmed that ruling without reviewing the record itself to ensure that the relief was appropriate). "[C]ompensatory education is a customary award for denial of a FAPE, [but] it is not automatic." *Gill v. District of Columbia*, 751 F. Supp. 2d 104, 107 (D.D.C. 2010). In some cases, compensatory education may be unwarranted "either because it would not help or because [the student] has flourished in his current placement." *Phillips ex rel T.P. v. District of Columbia*, 736 F. Supp. 2d 240, 247 (D.D.C. 2010). The District contends that this is such a case, citing Ms. Chisholm's testimony that S.S. had made some progress and could not reasonably be expected to make tremendous progress. Def.'s Opp'n at 13. Ms. Shaw disagrees, and notes that DCPS's failure to reevaluate S.S. harmed S.S. because it caused her IEPs to contain inappropriate goals. Pl.'s Mot. at. 5.

The District's implicit assumption that having updated evaluations would not have impacted the educational services that S.S. received conflicts with the principles underlying the

triennial review requirement. The IDEA requires periodic reevaluations "to determine the child's needs and abilities." *James v. District of Columbia*, 194 F. Supp.3d 131, 143 (D.D.C. 2016). "The role of [such] an evaluation is to contribute to the development of a sound IEP," and the failure to conduct one "means that [the student's] IEP might not be sufficiently tailored to her special and evolving needs [thereby] potentially compromis[ing] the effectiveness of the IDEA's protections." *Id.* at 143–44. As Ms. Anthony testified, conducting a comprehensive psychological evaluation and other assessments was necessary "in order to get a better picture of who [S.S.] really is and what she really needs." AR 837 (Anthony Test.). The data from such assessments could be used to develop educational services — such as tutoring, training, or classroom instruction — in areas that would address S.S.'s unique needs. Put simply, the evaluation is a means to an end, and the District mistakenly portrays it as an end in itself.

Although it seems apparent that a new psychological evaluation is insufficient, standing alone, to compensate S.S. for the denial of a FAPE, the record lacks sufficient evidence to enable the Court to fashion an appropriate remedy. S.S. received a comprehensive psychological evaluation in November 2018, which includes recommendations for vocational training and counseling. *See* Comprehensive Psychological Evaluation, ECF 25-1. The witnesses who testified at the due process hearing did not have the benefit of that recent evaluation and therefore based their recommendations and conclusions on outdated data. The recent evaluation, supplemented by expert testimony and S.S.'s education records, should provide a basis for determining what services, if any, DCPS could have incorporated into S.S.'s IEP during the 2015–2016 school year if it had properly reevaluated S.S. during the triennial review. That knowledge would provide a foundation for assessing how to redress those lost educational opportunities and restore S.S. to the position she would have been in if she had been reevaluated.

Faced with such a deficiency in the record, the Court may either conduct a further evidentiary inquiry itself or remand to the Hearing Officer. *See Branham*, 427 F.3d at 13 (noting that "*Reid* permits the district court either to take supplemental evidence or to return the case to the hearing officer"); *Wilson v. District of Columbia,* 770 F. Supp. 2d 270, 277 (D.D.C. 2011) (noting that where record lacks sufficient information regarding compensatory education, "remand or additional fact-finding is necessary"); *see also B.D.*, 817 F.3d at 799–800 (directing district court, on remand, to "either fashion a compensatory education award that seeks to put [the student] in the educational position he would be in" absent a FAPE denial "or remand to the Hearing Officer with instructions to do so"). Neither party has requested that the Court hear evidence or supplement the record, and Ms. Shaw expressly requests that the Court remand the matter to the Hearing Officer for further proceedings. *See* Pl.'s Mot. at 5; Pl.'s Reply at 5. The undersigned recommends that the trial judge remand this issue with instructions that the Hearing Officer conduct an additional hearing to determine the appropriate remedy and provide a detailed explanation of her conclusion based on the evidence presented by the parties. In those proceedings, the Hearing Officer should "craft an award that 'aim[s] to place [the student] in the same place [she] would have occupied but for the school district's violations of [the] IDEA.'" *Lopez-Young v. District of Columbia,* 211 F. Supp.3d 42, 54 (D.D.C. 2016) (quoting *Henry v. District of Columbia,* 750 F. Supp. 2d 94, 99 (D.D.C. 2010)); *Reid,* 401 F.3d at 526 (directing district court, on remand, to consider remanding to the hearing officer to craft an award of compensatory education); *see*, *e.g.*, *Wilson,* 770 F. Supp. 2d at 277 (remanding to the hearing officer to craft an award of compensatory education); *Walker v. District of Columbia,* 786 F. Supp. 2d 232, 239 (D.D.C. 2011) (same).

## II.     Whether the Hearing Officer Erred in Concluding that the Transition Plans Incorporated into S.S.'s IEPs were Meaningful and Did Not Deny S.S. a FAPE.

Ms. Shaw also challenges the adequacy of the transition plans incorporated into S.S.'s IEPs between February 2015 and April 2016.  The IDEA mandates that every IEP for a student who is at least sixteen years old must include "appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII); *see also Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 141–142 (D.D.C. 2018) (discussing scope of IDEA requirements concerning transition plans); *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 38–39 (D.D.C. 2013) (same).  Transition services must be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests."  20 U.S.C. § 1401(34)(B).  A transition plan is designed to "improv[e] the academic and functional achievement of a child with a disability, to facilitate the child's movement from school to post-school activities."  34 C.F.R. § 300.43(a)(1).

The Hearing Officer determined that the transition plans incorporated into S.S.'s February 2015, September 2015 and April 2016 IEP included appropriate goals.  The transition plans set several goals, including: that S.S. would contact a post-secondary educational program or a workforce development center to ask questions about the programs, AR 70–71, 105–08, 223–24 (IEPs); that S.S. would independently and accurately complete a Social Security card application and tax forms, AR 71(IEP); and that S.S. attend externship and job training, AR 70, 224 (IEPs).  The Hearing Officer reasoned that,

> While Student's advocates may have selected other goals for her that may even have been better suited to her needs, the transition goals her team selected were reasonably connected to her expressed interest, her realistic prospects, and were sufficiently ambitious to give her something substantive to strive toward without being so ambitious that she could not achieve them with accommodations.

AR 12.  Consequently, the Hearing Officer concluded that the transition plan did not deny S.S. a FAPE.[5]  AR 12.

Ms. Shaw contends that the transition plans "were not reasonably calculated to facilitate S.S.'s transition from high school to post-school life," and that they included "lofty and numerous" goals but failed to provide adequate instruction time for S.S. to master those goals. Pl.'s Mot. at 6–7.  To support that argument, Ms. Shaw asserts that S.S cannot tell time, cannot take the metro by herself, cannot count money on her own, and lacks "math skills, reading skills, common sense and memory."  *Id.*  The District counters that Ms. Shaw has failed to identify any harms caused by the alleged deficiencies in the transition plans, and therefore asks the Court to uphold the Hearing Officer's ruling.  Def.'s Opp'n at 14.

## A.    Overview of S.S.'s Transition Plans

The transition plan included in S.S.'s February 24, 2015 IEP discussed several issues pertinent to S.S.'s postsecondary transition including: S.S.'s interests and goals, AR 68; the results of the Brigance Transition Skills Inventory Academic Assessment ("Brigance TSI") and the Casey Life Skills Assessment which measured S.S.'s academic skills, job-related writing skills, and life skills, AR 68–70; annual transition goals for postsecondary education, training, and employment, AR 70–71; and the recommended course of study related to S.S.'s postsecondary goals and interests, *id.*  The goals in the transition plan corresponded to S.S.'s interests and the results of the assessments.  For example, S.S. was unable to independently complete a Social Security card application, AR 69, and the plan proposed an employment goal

_____

[5] The Hearing Officer determined that other aspects of the IEPs were "not *per se* a denial of FAPE," but "more likely than not" contained goals that were inappropriate.  AR 12.  Neither party has sought judicial review of that ruling.

that S.S. complete a Social Security card application, I-9 Form, and a W-4 Form with 100% accuracy. AR 71. Given that S.S had expressed interest in working at the Verizon Center and Downtown Locker Room to gain exposure to multiple jobs, the plan proposed that S.S. attend a community-based hospitality job training program upon graduation, and an "education and training" goal of contacting a post-secondary program of interest and asking four questions about the program via telephone. AR 68, 70. The plan projected that both goals would be achieved by January 2016. AR 70–71. The plan further proposed that S.S. would meet quarterly with a transitions coordinator, between January 2015 and January 2016, for a total of 480 minutes (eight hours) per year to accomplish her transition goals. *Id.*

The September 2015 IEP also included a transition plan. AR 105–08. It relied on the Brigance TSI and Casey Life Skills Assessments that were conducted in January and February 2015. AR 105–07. The September 2015 transition plan repeated the same goals identified in the February 2015 transition plan; that repetition was logical because the original projected timeframe for achieving those goals continued through January 2016. *Compare* AR 105–07 *with* AR 70–71. Indeed, the February 2015 and September 2015 transition plans are nearly identical, except that the September 2015 plan references S.S.'s interest in attending college, leaving DC, and "doing something in the field of culinary arts." AR 105.

In furtherance of the transition plans' goals, S.S. had opportunities to enroll in programs designed to prepare her for post-school life. In December 2015, the DCPS Office of Specialized Instruction accepted S.S. into the Competitive Employment Opportunities Exercises in Transition Academy ("CEO EXIT") Program, which would have provided 1.5 hours of training per week from January 2016 to May 2016 on how to "navigate and manage the expectation of postsecondary training or a workplace setting." AR 9, 136. On March 10, 2016, S.S. applied to

the CVS Workforce Initiative, which places special needs students into positions at local CVS stores.  AR 9, 137–140.  S.S. had expressed interest in a pharmacy technician position within the CVS program, but if she lacked the skills to qualify for that position she might have been assigned a more appropriate role.  AR  9; AR 137, 451.  The program would have placed S.S. at CVS's National Harbor location, and DCPS took steps to prepare her for traveling to that location.  AR 673 (Shaw Test.) (noting concerns with S.S.'s location placement at National Harbor); AR 1001 (Nace Test.) (noting that teachers drew a map and traveled with S.S. to plan her route); AR 1002 (Nace Test.) (describing DCPS' partnership with a program that offered to provide travel training to S.S.).

The April 25, 2016 IEP also contained a post-secondary transition plan, which built upon the previous year's transition plans and factored in more recent assessment results from Brigance TSI and Casey Life Skills Assessment testing completed in April 2016.  AR 223.  The plan discussed: S.S.'s interests and goals, *id.*; the results of the assessments, AR 223–25; and annual transition goals for education, training, and placement, AR 223–24.  The plan's recommendations reflected S.S.'s skills and interests.  For example, S.S. had low scores on the "Housing and Money Management" and "Work and Study Life" sections, so the transition plan focused on developing "the work and study life habits that [would] prepare her to be successful in training and education after graduating from high school."  AR 223.  Given S.S.'s inability to explain any details about the post-secondary program she had chosen, the plan proposed: (1) that S.S. interview a representative from the workforce development center and ask the representative at least four questions, AR 224; and (2) that S.S. complete 160 hours of CVS externship training in the pharmacy technician track, AR 224.  The plan targeted June 2016 as a deadline for accomplishing those goals.  AR 224.  Ultimately, Ms. Shaw had concerns regarding S.S.'s ability

to travel to the CVS location and whether she had the requisite skill set to be a pharmacy technician, and she did not allow S.S. to enroll in the CVS Workforce Initiative; consequently, DCPS discontinued the travel training. AR 9; AR 1001–02 (Nace Test.).

      **B.**      **<u>Appropriateness of S.S.'s Transition Plans</u>**

Ms. Shaw has failed to meet her burden of showing that the Hearing Officer erroneously deemed the transition plans appropriate. Although the Hearing Officer's analysis was brief, it was supported by record evidence and consistent with the applicable law. The transition plans were based on S.S.'s needs and interests and included measurable goals based on transition assessments, and therefore satisfy the requirements of the IDEA. Accordingly, the undersigned recommends that the trial judge uphold the Hearing Officer's conclusion that the transition plans did not deny S.S. a FAPE.

First, the plans were based on "age appropriate transition assessments related to training, education, employment, and . . . independent living skills." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). The Hearing Officer made a factual finding that the transition goals were based on the Brigance TSI and Casey Life Skills Report, and the plans clearly identify those assessments as a data source. AR 8, 68, 105, 223. Those assessments tested the subject areas identified in Section 1414(d)(1). AR 68–70, 105–07, 222–24. Mr. Nace's testimony that those assessments were appropriate for this context and properly administered supports the Hearing Officer's factual finding that the Brigance TSI was "age-appropriate" and that the Casey Life Skills Assessment was "a reasonable assessment to use for [S.S.]." AR 8 (factual findings regarding appropriateness and reasonableness of tests); AR 1014 (Nace Test.) (describing the Casey Life Skills Report as an appropriate self-assessment transition tool for students to use to express their interests); AR 1015–16 (Nace Test.) (noting that the Brigance TSI Assessments in education,

academic, and living assessments were appropriately administered). Ms. Shaw's expert, Ms. Anthony, characterized the Casey Life Skills report as "a phenomenal assessment." AR 745. Both assessments provided information regarding S.S.'s interests and her strengths and ultimately informed her transition plans, as required under 20 U.S.C. § 1401(34)(B). Although Ms. Anthony noted that additional Brigance TSI sub-assessments could have been valuable, AR 891–893, the statute does not require a school district to use every available test, and DCPS reasonably relied on the data it possessed. *Cf. Middleton*, 312 F. Supp. 3d at 142 (concluding that IDEA did not require school district to conduct the assessments that the parent preferred instead of relying on the assessments it had selected). Ms. Shaw's assertion that DCPS's failure to conduct new assessments in connection with the triennial review affected the accuracy of the transition plans also lacks merit. The record clearly demonstrates that the transition plans were based on the results of tests conducted in the same year that the plans were developed. AR 68–70, 105–07, 222–24. Therefore, the FAPE denial that the Hearing Officer attributed to using outdated assessments in the triennial review did not extend to S.S.'s transition plans.

The transition plans also were responsive to S.S.'s needs, "taking into account [her] strengths, preferences, and interests." 20 U.S.C. § 1401(34)(B). As discussed above, the plans identified areas where S.S. had weak skills, proposed training and tasks aimed at ameliorating those deficits, and also proposed training opportunities in areas in which S.S. had expressed an interest. DCPS attempted to enroll S.S. into two work-based learning programs developed for students with special needs, which would have given S.S. the type of experience that facilitates a successful transition. AR 1016 (Nace Test.) (opining that the number one predictor of success for students transitioning is paid work experience before the student graduates).

Ms. Shaw contends that DCPS aimed too high, and that the transition plans set unrealistic goals given S.S.'s limitations and the limited time (eight hours) allocated for certain training. However, DCPS's expert explained the school's philosophy to "not ever . . . tell a student that they cannot do something . . . It's actually far more important for them to realize what is feasible for them to do as opposed to someone telling them they can't do it because they don't have the math skills or the reading skills or what have you." AR 997–98 (Nace Test.). Neither Ms. Shaw nor the Court is an educational policy and curriculum expert, and ample record evidence supports the Hearing Officer's decisions. Accordingly, the Hearing Officer's assessment of the appropriateness of the goals warrants deference. Further, although the transition plans allotted only eight hours of instruction time for certain skills, the CVS program would have provided up to 160 hours of an externship through which S.S. could have gained meaningful transition skills. Having elected not to allow S.S. to pursue that training, it is unreasonable for Ms. Shaw to fault the District for failing to provide meaningful opportunities for S.S. to learn transition-related skills.

For the foregoing reasons, the undersigned recommends that the trial judge uphold the Hearing Officer's determination that the transition plans satisfied the requirements of the IDEA and therefore did not deny S.S. a FAPE.

### III.    Whether the District Denied S.S. a FAPE by Failing to Allow Ms. Shaw to Participate in All Aspects of S.S.'s Educational Planning After S.S. Turned Eighteen.

The parties dispute whether DCPS gave Ms. Shaw a sufficient opportunity to participate in S.S.'s educational planning after S.S. turned eighteen and whether any such denial rose to the level of denying S.S. a FAPE. The IDEA guarantees parents of children with disabilities the opportunity to participate in the IEP process. *See* 20 U.S.C. §§ 1414, 1415(b)(1). Indeed, "[t]he

core of the statute . . . is the cooperative process that it establishes between parents and schools."

*Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 53 (2005) (citing *Rowley*, 458 U.S. at 205–06).

Typically, when a child with a disability reaches the age of majority under State law, all rights

accorded to parents under the IDEA transfer to the child. *See* 20 U.S.C. § 1415(m)(1).

However, states may establish procedures for appointing the student's parent to represent the

student's educational interests. *Id.* § 1415(m)(2). In the District of Columbia, a parent who is

delegated power of attorney becomes the student's agent and has the right to make educational

decisions, receive notices, and participate in meetings and any other procedures related to the

student's educational program on behalf of the student. *See* D.C. Code § 38-2571.04.

      The Hearing Officer determined that Ms. Shaw participated in several aspects of S.S.'s

educational planning after S.S.'s eighteenth birthday, and therefore concluded that DCPS did not

deny S.S. a FAPE. AR 12. The Hearing Officer based that conclusion on the following factual

findings: (1) that Ms. Shaw attended the September 2015 IEP meeting, AR 7, 12; (2) that the IEP

states, and the Special Education Coordinator testified, that Ms. Shaw attended the April 2016

IEP meeting by phone, but Ms. Shaw denied knowing about or attending that meeting, AR 7, 12;

and (3) that Ms. Shaw had other discussions with S.S.'s teachers and school staff after S.S.

turned eighteen, AR 12. The Hearing Officer also concluded that Ms. Shaw's Durable Power of

Attorney for S.S. "does not prohibit Student from acting on her behalf, it merely permits Parent

to participate as a decision-maker." AR 27.

      Ms. Shaw contends that she was excluded from aspects of S.S.'s educational planning,

including an April 2016 IEP planning meeting.[6] Pl.'s Mot. at 12. Ms. Shaw further argues that

---

[6] Ms. Shaw also identifies the District's failure to provide prior written notice of S.S.'s graduation as an example of her exclusion from the educational process and faults the Hearing Officer for failing to assess whether this denied S.S. a FAPE or to fashion a remedy. *See* Pl.'s

the school advocated for S.S. to speak for herself as an adult and told Ms. Shaw that she was "babying" her daughter. AR 12; AR 673–64 (Shaw Test.); AR 663 (S.S. Test.). Ms. Shaw asserts that her inability to fully participate in the educational process denied S.S. a FAPE. Pl.'s Mot. at 11–12. The District counters that Ms. Shaw was an active participant and that S.S.'s educational partners engaged with Ms. Shaw, as demonstrated by her participation in a September 2015 IEP meeting. Def.'s Opp'n at 17. The District therefore asks the Court to uphold the Hearing Officer's resolution of this dispute.

Ms. Shaw had the right to participate in S.S.'s education after S.S. turned eighteen because Ms. Shaw had Power of Attorney status. S.S. reached D.C.'s age of majority, eighteen years old, in July 2015. *See* AR 671 (Shaw Test.). Ms. Shaw obtained Durable Power of Attorney on November 5, 2015. AR 5; AR 131–35 (Durable Power of Attorney ("POA")). The Durable Power of Attorney authorized Ms. Shaw to "act as [S.S.'s] educational decision-maker to the full extent that [S.S. could] act for [herself], including authority to . . . participate in any education related discussion or meeting about [S.S.], determine educational placement, and . . . make other school-related decisions." AR 132 (POA).

Ms. Shaw has not carried her burden of demonstrating that the Hearing Officer erroneously determined that Ms. Shaw continued to participate in the educational planning process after S.S. turned eighteen. Ms. Shaw does not deny that she attended meetings for the September 2015 IEP. Although Ms. Shaw claims not to have attended the April 2016 IEP meeting, there was contrary evidence in the record. *Compare* AR 679, 683 (Shaw Test.) *with* AR 207 (IEP) (listing participants). The IEP listed Ms. Shaw as an attendee by telephone, and

_____

Mot. at 12–13. The Court will address that issue when it resolves Ms. Shaw's challenge to DCPS's decision to graduate S.S., as the Hearing Officer considered those issues together.

the Special Education Advocate who attended that meeting testified that Ms. Shaw was present. AR 207 (IEP); AR 943 (Chisholm Test.). The Hearing Officer's conclusion that the record precluded her from determining that Ms. Shaw missed that meeting implicitly contains a credibility assessment; the Hearing Officer did not find Ms. Shaw's testimony sufficiently credible to overcome the evidence indicating that she attended the meeting. That assessment warrants "particular deference." *R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89–90 (D.D.C. 2005) ("Where the Hearing Officer's findings are based on credibility determinations of live witness testimony, . . . and there is no supplementation of the record before the Court, particular deference is due to the Hearing Officer's decision.").

Ms. Shaw's assertion that teachers and school officials discouraged her from participating in the decision-making process does not undermine the Hearing Officer's ruling. According to Ms. Shaw, the school refused to include her in educational decisions and told her that she was "babying" her daughter. *Id.* at 12, AR 673–74. S.S. testified that when she asked for her mother to be present at meetings regarding her educational planning, her teachers told her that she should speak for herself as an adult. *Id.* at 13, AR 663. However, the Hearing Officer determined that Ms. Shaw participated in some discussions with S.S.'s teachers and school staff after S.S. turned 18. *See* AR 12. Although that conclusion appears under the "legal conclusions" heading, it is a factual finding and therefore warrants deference absent "contrary nontestimonial extrinsic evidence [in] the record." *Savoy*, 844 F. Supp. 2d at 30. The testimony Ms. Shaw cites cannot overcome that factual finding.

In sum, the record demonstrates that Ms. Shaw actively participated in the educational planning process. Accordingly, the undersigned recommends that the trial judge uphold the Hearing Officer's resolution of this issue.

**IV.    Whether the District Denied S.S. a FAPE by Failing to Provide Prior Written Notice of S.S.'s Graduation and Prematurely Graduating S.S. from High School.**

The parties dispute two aspects of the HOD that pertain to S.S.'s graduation from high school.  First, Ms. Shaw argues that the Hearing Officer erroneously failed to recognize that DCPS's failure to provide prior written notice of S.S.'s upcoming high school graduation constituted a denial of a FAPE that required a remedy.[7]  Pl.'s Mot. at 12–13.  Second, Ms. Shaw contends that the Hearing Officer erroneously failed to conclude that DCPS denied S.S. a FAPE by prematurely awarding her a high school diploma despite her low level of academic performance and her inability to master certain fundamental skills.  Pl.'s Mot. at 8–9.  The District contends that the Hearing Officer's rulings should be upheld because they are consistent with the law and supported by record evidence.  Def.'s Opp'n at 15–16; Def.'s Reply at 6–7.

**A.    The District's Failure to Provide Prior Written Notice of S.S.'s Graduation**

The IDEA mandates that "whenever the local educational agency . . . proposes to initiate or change . . . [the] educational placement of the child," the local educational agency must send prior written notice.  20 U.S.C. § 1415(b)(3), (c)(1); 34 C.F.R. § 300.503(a).  The prior written notice must include:

> (1)     A description of the action proposed or refused by the agency;
> (2)     An explanation of why the agency proposes or refuses to take the action; and
> (3)     A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action.

---

[7] Although the Hearing Officer discussed this issue as part of her analysis of Ms. Shaw's challenge to DCPS's decision to award a diploma to S.S. and graduate her from high school, Ms. Shaw briefed this issue in conjunction with her broader claim that she was not permitted to participate fully in the educational process.  *Compare* AR 12 *with* Pl.'s Mot. 12–13.

34 C.F.R. § 300.503(b)(1)–(3); *see also* D.C. CODE § 38–2571.03. A failure to provide prior written notice is a procedural violation of the IDEA, which constitutes a denial of a FAPE only if it negatively impacts "the student's substantive rights." *Lesesne*, 447 F.3d at 834. Procedural violations may rise to the level of denying a FAPE when they impede "the child's right to a [FAPE]," or "the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]," or deprive a student of "educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Brown*, 179 F. Supp. 3d at 25 ("[T]here must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of education benefits.").

The Hearing Officer determined that DCPS failed to give Ms. Shaw or S.S. prior written notice that S.S. was graduating and concluded that this "failure to receive the PWN inhibited Parent's ability to participate in providing FAPE to Student." AR 13. The Hearing Officer based that conclusion on the fact that the notice "would have included information about other options the school considered and rejected, such as allowing Student to remain at school beyond June 2016," and Ms. Shaw's testimony that "while student would have objected, Parent would have been in favor of this option." *Id.* As the District did not appeal this ruling, the Court has no grounds to reconsider or disturb the Hearing Officer's conclusion.

Despite having concluded that the lack of prior written notice "inhibited" Ms. Shaw's participation in the provision of a FAPE, the Hearing Officer did not formally rule that this omission constituted a denial of a FAPE. AR 13. Consequently, the

Hearing Officer appears not to have evaluated whether and how to remedy the lack of prior written notice. Ms. Shaw contends that failing to provide the prior written notice denied S.S. a FAPE because it excluded Ms. Shaw from participating in a key educational decision (whether to graduate or remain in school) and thereby "drastically changed the course of S.S.'s education." Pl.'s Mot. at 13. As a remedy, Ms. Shaw asks the Court to reverse the Hearing Officer's ruling and remand so that the Hearing Officer can award compensatory education to redress the FAPE denial. Pl.'s Mot. at 14; Pl.'s Reply at 11. The District did not directly address the lack of prior written notice in its briefs, and instead focused on Ms. Shaw's broader challenge to her ability to participate in the educational process. *See* Def.'s Opp'n; Def.'s Reply.

The Hearing Officer's findings compel the conclusion that the lack of prior written notice denied S.S. a FAPE. Prior written notice is intended to "provide sufficient information to protect the parents' rights under the Act" and "enable the parents to make an informed decision whether to challenge the DCPS's determination and to prepare for meaningful participation in the due process hearing on their challenge." *Middleton*, 312 F. Supp. 3d at 135 (quoting *Jalloh v. District of Columbia*, 968 F. Supp. 2d 203, 213 (D.D.C. 2013)) (internal citations omitted). Accordingly, a failure to provide prior written notice constitutes a denial of a FAPE where, as here, it significantly inhibits a parent's ability to make informed decisions about important educational issues, such as S.S.'s upcoming graduation. *Cf. Brown*, 179 F. Supp. 3d at 27–28 (concluding when reviewing omissions in an IEP that a procedural defect "deprives a student of a FAPE if it 'significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child'") (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). As the Hearing Officer acknowledged, due to the lack of

prior written notice of S.S.'s graduation, Ms. Shaw was not aware of the full ambit of alternatives to graduation, and thus did not know that S.S. was eligible to remain in school until she was twenty-two years old.  AR 13; AR 678–680 (Shaw Test.).  Ms. Shaw would have recommended pursuing alternatives to graduation if she had been informed of those options.  *Id.* Had those objections been heeded, S.S. might have continued to attend Anacostia High School for a longer period of time and could have received additional education during her enrollment. Accordingly, depriving Ms. Shaw of an opportunity to advocate that S.S. remain in school constitutes a FAPE denial.  *See Brown*, 179 F. Supp. 3d at 27 (concluding that failure to fully describe a component of an IEP denied student a FAPE because it "effectively deprived plaintiff of the opportunity 'to understand what services [would] be provided and make a determination about whether a proposed placement [wa]s adequate'") (quoting *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 70 (D.D.C. 2010)).

For the foregoing reasons, the undersigned recommends that the trial judge hold that the failure to provide prior written notice denied S.S. a FAPE and remand this issue so that the Hearing Officer can determine the appropriate remedy for this FAPE denial.  Although S.S. has graduated high school, it may be possible to fashion an award of compensatory education to cure the harm caused by the school's failure to inform Ms. Shaw that S.S. could have extended her time at school, *i.e.* by providing education or training comparable to what S.S. would have received if her graduation had been deferred.

B. **DCPS's Decision to Award S.S. a Diploma and Graduate Her from High School.**

The IDEA and local laws require DCPS to provide a "free appropriate public education" to all handicapped children between ages three to twenty-two.  5-E D.C.M.R. § 3002.1(a); 20 U.S.C. § 1412(a)(1).  Under D.C. law, that obligation ends once a student

graduates from high school with a regular high school diploma.  *See* 5-E D.C.M.R.

§ 3002.2 (c).  The Supreme Court has interpreted the IDEA's FAPE requirement to mean

that States must provide "'a basic floor of opportunity . . . individually designed to

provide educational benefit to the handicapped child.'"  *Leonard by Leonard v.*

*McKenzie,* 869 F.2d 1558, 1561 (D.C. Cir. 1989) (quoting *Rowley*, 458 U.S. at 200–01).

Congress recognized that "providing special education and related services to

handicapped children is not guaranteed to produce any particular outcome."  *Rowley,* 458

U.S. at 192 (quoting S. Rep. No. 94–168, at 11 (1975)).  "Thus, the intent of the Act was

more to open the door of public education to handicapped children on appropriate terms

than to guarantee any particular level of education once inside."  *Id.*  Consequently,

educational programs are not required to "maximize the potential of handicapped

children," but must provide programming "sufficient to confer some educational benefit."

*Rowley,* 458 U.S. at 189, 200.

The parties dispute whether allowing S.S. to graduate with a diploma in 2016,

when her academic skills were between a third- and fifth-grade level, satisfied the school

district's obligation to provide her a FAPE.  Ms. Shaw contends that S.S.'s graduation

was a "social promotion" which inappropriately pushed S.S. out of the school system

before she had an adequate academic foundation.  Pl.'s Mot. at 9–10.  The District argues

that it was reasonable to award S.S. a diploma because she adamantly desired to graduate

that year, and suggests that, due to S.S.'s Intellectual Disability, S.S. would have been

unlikely to make significant academic progress even if she had remained in school.

Def.'s Opp'n at 15.

The Hearing Officer made several factual findings that are pertinent to this issue, which must be presumed to be correct absent nontestimonial evidence that contradicts those findings. First, the Hearing Officer found that S.S. "was adamant that she wanted to graduate." AR 6. The Hearing Officer further determined that although an IEP team can recommend that a student remain in school after age eighteen, "if a student has met the graduation requirements and has stated (along with their parent) that they want to leave, DCPS is not allowed to overrule the parent and student." AR 6–7. The Hearing Officer acknowledged that when she graduated, S.S. "was performing between a 3rd and 5th academic grade level." AR 7. However, the Hearing Officer concluded that "[a] student with an Intellectual Disability would not be expected to be on grade level at graduation. Based on Student's cognitive abilities, she would not be expected to reach grade level prior to graduating. Student's Intellectual Disability will limit the amount of academic progress she will be able to make." AR 7.

The Hearing Officer concluded that DCPS did not deny S.S. a FAPE by permitting her to graduate with a diploma on time and declining to counsel her to delay her graduation. AR 13. The Hearing Officer relied heavily on the fact that S.S. wished to graduate, emphasizing that "Student and Parent consistently opted to maintain Student on the high school diploma track throughout her time at District School." AR 12; *see also* AR 13 ("Student, including as an adult, was adamant about graduating at the originally scheduled time."). The Hearing Officer acknowledged that "there remain gaps in [S.S.'s] academic knowledge and functional skills," but deemed that "not necessarily unanticipated for a student with an Intellectual Disability." *Id*. The Hearing Officer also observed that if Plaintiff's counsel and her Educational Advocate had been involved in

the IEP process, they might have provided input regarding whether S.S. should graduate as soon as she was eligible to do so, but reasoned that by choosing a diploma track "Parent, Student, and the rest of Student's IEP team selected a permissible option." *Id.* Therefore, the Hearing Officer rejected Ms. Shaw's challenge to S.S.'s graduation. *Id.*

The Hearing Officer's ruling, and the District's arguments urging affirmance of that ruling, rest on the assumption that a disabled student's wishes dictate whether that student should be permitted to graduate on the diploma track instead of being awarded a certificate or remaining in school beyond age eighteen. However, the HOD cites no law or precedent to support that assumption. The Hearing Officer based her factual finding that DCPS cannot overrule a student's desire to graduate if both the student and the parent wish to leave and the student has met the graduation requirements on the testimony of Ms. Anthony, an Educational Advocate and Plaintiff's expert witness. AR 6; *see also* AR 874 (Anthony Test.). However, Ms. Anthony's testimony cannot fairly be interpreted to indicate that she believed that DCPS had to acquiesce to S.S.'s desire to graduate under the circumstances present in this case. She acknowledged, on cross-examination, that DCPS could not force a student who meets graduation criteria and who (along with his parent) wishes to graduate to remain in school against his wishes. AR 874 (Anthony Test.). However, Ms. Anthony did not assert that S.S. met the criteria for graduating with a diploma. To the contrary, Ms. Anthony believed that S.S. was not ready to graduate and that the IEP team should have met with S.S. and Ms. Shaw to recommend that, based on S.S.'s relative lack of progress and regression in certain areas, S.S. extend her time in high school. AR 702, 831–33 (Anthony Test.).

Even assuming that the Hearing Officer correctly concluded that DCPS must defer to a student's and parents' wishes in certain situations, the Hearing Officer did not make sufficient factual findings to establish that S.S.'s case presented such a situation – the HOD contains no analysis of what the diploma requirements were at Anacostia High School in the 2015–2016 school year or whether S.S. had met them. Instead, the Hearing Officer simply noted in the factual findings that S.S. would not have been expected to perform at grade level in order to graduate. AR 7.

Finally, even if Ms. Shaw initially concurred in the decision to place S.S. on the diploma track during the IEP process, the Hearing Officer acknowledged that Ms. Shaw likely would have objected to S.S.'s graduation if she had been advised of the alternatives, such as deferring graduation until a later date. Therefore, it is unreasonable to accord substantial weight to Ms. Shaw's purported prior agreement that S.S. should graduate on time. In sum, the Hearing Officer's factual finding that DCPS must honor a student's desire to graduate under certain hypothetical circumstances does not support a factual or legal conclusion that DCPS was required to honor S.S.'s desire to graduate under the circumstances present in this case.

As noted, the touchstone of whether a school district has provided a FAPE is whether the student derives an adequate "educational benefit" from the services the school provides. *Endrew*, 137 S. Ct at 996. Neither party has cited precedent applying those principles to the question presented here — whether the school district prematurely terminated the student's education by awarding her a high school diploma when she was performing at an elementary school grade level. The decision whether to place a student on the diploma track is an educational placement decision made in conjunction with the

development and implementation of the student's IEP.  *See Middleton*, 312 F. Supp. 3d at 131 (concluding that "the decision whether to put a student on diploma or certificate track constitutes an educational placement under the IDEA because it undoubtedly shapes fundamental elements of the student's programming"); *Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 227 (D.D.C. 2015) (noting that IEP team discussed instructional requirements necessary to place student on the diploma track).  Accordingly, cases in which a parent challenges the sufficiency of an IEP or the educational placement decisions contained therein are the most analogous lines of precedent.  The Court will draw on precedent from those contexts to frame its analysis of the instant dispute.

Treating S.S.'s wishes as dispositive of whether DCPS should have awarded her a diploma diverges from the analysis courts typically apply when evaluating challenges to a student's IEP and educational placement decisions.  Courts reviewing IEPs assess whether an IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew*, 137 S. Ct. at 999, instead of simply asking whether the IEP reflects the student's or parent's preferences.  *Cf. Shaw v. District of Columbia*, 238 F.Supp. 2d 127, 139 (D.D.C. 2002) (noting that the while the IDEA guarantees a free and appropriate education, it does not provide that a student's education "will be designed according to the parent's desires"); *see Rowley,* 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.").  Courts apply the same standard when reviewing challenges to educational placement decisions, assessing whether the placement was designed to permit appropriate

progress for the student instead of focusing on the student's or parent's desires. *See, e.g.*, *Middleton*, 312 F. Supp. 3d at 138–39 (concluding "testimony that a diploma track placement would make [the student] feel 'successful' and bolster his self esteem is evidence far too thin" to support school's decision to place the student on a diploma track). *Accord Aaron P. v. Dep't of Educ., Haw.,* No. 10–574, 2011 WL 5320994, at *32 (D. Hawai'i Oct. 31, 2011) (concluding that while the court was sympathetic to parents' frustration that their child had not progressed "as much as they wanted her to," the IDEA requires the court to ascertain whether the student gained educational benefit instead of basing decision on the parents' desire for additional resources in the IEP) (cited by *K.S. v. District of Columbia,* 962 F. Supp. 2d 216, 221–22 (D.D.C. 2013)). As the Third Circuit has recognized, "a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . . Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly." *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). The District has cited no precedent that supports the notion that a school district may cede its responsibility to craft an appropriate educational plan or educational placement to the parents or a student.

Deferring to a student's desire to graduate notwithstanding her relative lack of academic skills also may violate D.C. law. When litigating a different IDEA case involving an IEP developed in 2015, the District asserted that D.C. regulations establish minimal academic requirements that a student must complete to receive a high school

diploma. *See Middleton*, 312 F. Supp. 3d at 131–32 (citing D.C. Mun. Regs. Tit. 5–A. § 2203.1). The record in *Middleton* and applicable regulations indicated that "[t]o pass each diploma-track course students, including those with disabilities, must demonstrate curriculum standard knowledge." *Middleton*, 312 F. Supp. 3d at 131 (discussing regulatory requirements). The regulations required students to complete certain coursework in specific subject areas and established minimum coursework requirements in specific academic subject areas, including "Algebra 1, Geometry, and Algebra II at a minimum." D.C. Mun. Regs. Tit. 5—A. § 2203.3. Disabled students who are unable to meet those criteria may graduate with a "IEP Certificate of Completion." *Id.* § 2203.8; *Middleton*, 312 F. Supp. 3d at 132. Here, neither the HOD nor the District addressed those regulations, and therefore the record does not establish whether those requirements applied here[8] and, if so, whether S.S. could reasonably have been expected to meet those requirements through courses tailored to her disabilities. *See* AR 13. Given that S.S. was performing at a third to fifth grade level academically, it seems unlikely that S.S. could meet the minimum standards codified in Section 2203.3, which required geometry and Algebra II.

Although the Hearing Officer did not address any applicable regulatory requirements governing S.S.'s eligibility for a high school diploma, the HOD does briefly discuss witnesses' testimony regarding the requirements for placing a student on the diploma track. Specifically, the HOD cites the testimony of Plaintiff's educational

---

[8] The regulations establish a process for schools to request waivers of the curricular requirements beginning in the 2016–2017 school year. D.C. Mun. Regs. Tit. 5—A. § 2203.7. It is unclear whether a similar exemption was available while S.S. was enrolled at Anacostia High School, and the record contains no evidence that the school had requested or successfully obtained a waiver.

advocate, Ms. Anthony, to support a factual finding that IEPs for students on the high school diploma track must contain academic goals aligned to the Common Core standards and that the student may be given accommodations to make the goals more attainable. AR 6; AR 868–69 (Anthony Test.). Ms. Chisholm (the District's expert in special education placement and programming) opined that IEPs must address Common Core standards, and that students' work may be adjusted to facilitate their ability to progress towards those standards. AR 940–942 (Chisholm Test.). Neither Ms. Chisholm nor Ms. Anthony addressed whether the Common Core standards impose minimal academic requirements as prerequisites to achieving a diploma, or whether modified Common Core goals could substitute for the specific curricular requirements codified in Section 2203.3. Instead, Ms. Chisholm tied graduation to a student's ability to "mak[e] progress on the diploma track." AR 6; AR 965 (Chisholm Test.). Consequently, the Hearing Officer did not quantify the amount of progress that a student must make towards the Common Core grade level goals to be eligible to graduate with a diploma.

Due to the analytical deficiencies discussed above, the Hearing Officer's resolution of this issue does not warrant deference. The Hearing Officer clearly misframed the issue by focusing on S.S.'s 'adamance' to graduate and failing to address whether timely graduation on the diploma track was an appropriate and realistically attainable educational plan for S.S. The more difficult question to answer is whether DCPS's decision to award S.S. a diploma despite her academic shortcomings denied her a FAPE, or whether S.S. received all the educational benefits to which she was entitled prior to her graduation.

The Hearing Officer and the District defend S.S.'s graduation by implying that S.S. would not have benefited from further education given the nature of S.S.'s disability. AR 13; Def.'s Opp'n at 15. Declining to extend S.S.'s high school education based on an assumption that her disability would render further education fruitless is at odds with the principles that underlie the IDEA. As the Supreme Court has recognized, "a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to sitting idly . . . awaiting the time when they were old enough to drop out. The IDEA demands more." *Endrew*, 137 S. Ct. at 1001 (articulating standards that should govern a court's evaluation of the adequacy of an IEP) (internal quotation marks omitted).

To be sure, the IDEA "stops short of requiring public schools to provide the best possible education for the individual child, or an education equal to that of non-disabled peers." *Z.B. v. District of Columbia*, 888 F.3d 515, 519 (D.C. Cir. 2018). It requires only that education services be tailored to a student's "unique needs." In some cases, a student's unique attributes may preclude her from achieving much more than *de minimis* academic progress. In those circumstances, the student's lack of progress does not prove that the school denied the student a FAPE. *See J.B. ex rel. Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018) (concluding that *Endrew* "certainly does not stand for the proposition that any time a child makes negligible (or uneven) academic progress, the school system has violated the IDEA").

The record does not establish that S.S. was incapable of progressing beyond the academic and functional skills she had attained as of her graduation, and therefore does

not support the District's assumption that it would have been unrealistic to set any further academic goals for S.S. to attain before awarding her a diploma. The District cites Ms. Chisholm's testimony that "[a] student with intellectual disability is expected to make limited progress, that is a function of the disability, and so under no circumstances would [she] expect S.S. who qualifies for intellectual disability, to make tremendous progress." AR 950 (Chisholm Test.); *see* Def.'s Opp'n at 15. However, Ms. Chisholm also concluded that data from S.S.'s assessments demonstrated that S.S. had made progress on her IEP goals[9] and was making progress towards receiving her diploma. AR 965 (Chisholm Test.) ("The data showed us that she was making progress on the diploma track."); AR 950 (Chisholm Test.) (noting that S.S. made some progress on the goals in her IEP). For the 2014–2015 school year, S.S.'s teachers reported consistent progress in a range of subject areas, with mastery in goals in the Communication/Speech and Language subject area and Emotional, Social, and Behavior Support subject areas. *See* AR 75–85. A year later, S.S.'s April 2016 Progress Report noted that S.S. was "progressing" in each subject area but lacked specific commentary on what that progress entailed. *See* AR 240–50. There is no reason to presume that S.S. would have failed to make similar incremental progress if she had remained at Anacostia High School for another year.

At bottom, there are too many gaps in the record for the Court to conclusively determine whether DCPS's decision to graduate S.S. and award her a diploma deprived

---

[9] Ms. Chisholm identified several data points that purportedly demonstrated S.S.'s progress. For example, the materials attached to S.S's diploma reveal that S.S.'s Scholastic Reading Inventory (SRI) score increased from 691 to 772 from September 2014 to May 2016. AR 261–262. However, the record provides no context for these increased scores, and it is therefore unclear whether that reported progress is substantial.

her of an "appropriate" education. First, DCPS's failure to re-evaluate S.S. during the triennial review makes it difficult to identify the baseline by which her skills and accomplishments should be measured. Second, the lack of evidence regarding the curricular requirements Anacostia High School students must meet before graduating with a diploma impedes any assessment of whether S.S. could realistically be expected to achieve those requirements or derive more than a minimal educational benefit from courses tailored to those requirements. Relatedly, without knowing how S.S.'s progress (or lack thereof) aligns with the diploma track requirements, the Court cannot evaluate whether S.S.'s purported "progress on the diploma track," made it reasonable to keep her on that track, AR 965 (Chisholm Test.), or whether her relative lack of progress should have alerted school officials that she was not ready to graduate. Absent such information, the Court cannot ascertain whether S.S.'s graduation was simply a 'social promotion' or an appropriate goal in an educational plan tailored to S.S.'s unique educational needs. Finally, the witnesses' failure to engage in any substantive discussion of whether the certificate track presented a viable alternative for a student with S.S.'s skillset makes it impossible to ascertain whether placing S.S. on the certificate track or deferring her graduation would have more appropriately addressed S.S.'s academic and functional needs than awarding her a diploma in 2016.[10] *See* AR 865 (Anthony Test.)

---

[10] Troublingly, the District appears to view placement on the diploma track as a "default" choice, instead of recognizing that it is an educational placement decision that must be scrutinized to ensure that it is reasonably calculated to provide the student with educational benefits. *See* AR 965 (Chisholm Test.) (stating that placing students on the diploma track is the "default" absent data showing that the student was not capable of progress). Placing a student on the path to a diploma is a significant educational placement decision, and making that decision by default instead of in response to student's' individual needs "is antithetical to the spirit and letter of the IDEA." *Middleton*, 312 F. Supp. 3d at 132.

(acknowledging on cross-examination that the certificate track is an alternative to a diploma track); *see also* D.C. Mun. Regs. Tit. 5—A. § 2203.8 (noting that students with special needs who cannot achieve a diploma are "eligible to receive an Individual Educational Program (IEP) Certificate of Completion").

For the foregoing reasons, the undersigned recommends that the trial judge remand this issue so that the Hearing Officer can further develop the record and determine in the first instance whether the decision to award S.S. a diploma satisfied DCPS's obligation to provide S.S. a FAPE. The unanswered factual questions identified above are all germane to assessing whether DCPS's decision to award S.S. a diploma prematurely deprived S.S. of further educational benefits to which she was entitled. Although this Court could independently conduct evidentiary hearings to supplement the record, resolving this issue is likely to implicate educational policy concerns that fall within the Hearing Officer's expertise. Clear remand instructions should prevent the Hearing Officer from repeating the same mistakes that undermine the conclusions drawn in the February 2017 HOD.

## RECOMMENDATION

For the reasons set forth in detail above, the undersigned recommends that the Court grant-in-part and deny-in-part Plaintiff's Motion for Summary Judgment, and grant-in-part and deny-in-part Defendant's Cross-Motion for Summary Judgment. Specifically, the undersigned recommends that the trial judge: (1) grant Plaintiff's motion insofar as it challenges the Hearing Officer's decision to award only a new psychological assessment and direct the Hearing Officer to provide a detailed evidence-based analysis of the appropriate relief necessary to redress DCPS's reliance on outdated evaluations

46

during the triennial review; (2) deny Plaintiff's motion insofar as it challenges the Hearing Officer's finding that there was a denial of a FAPE based on an inappropriate transition plan; (3) grant Plaintiff's motion insofar as it seeks a ruling that the District denied S.S. a FAPE by failing to provide prior written notice of S.S.'s graduation and remand for the Hearing Officer to determine an appropriate remedy; (4) (a) grant Plaintiff's motion insofar as it seeks to reverse and remand the Hearing Officer's decision that the District did not prematurely graduate S.S. from school and (b) remand the matter to the Hearing Officer to further develop the record to determine whether the District denied S.S. a FAPE by awarding her a diploma in 2016 and then fashion an appropriate remedy if the Hearing Officer finds that S.S.'s graduation denied S.S. a FAPE.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: _____    February 8, 2019

                                        _____
                                        ROBIN M. MERIWEATHER
                                        UNITED STATES MAGISTRATE JUDGE